**IN THE UNITED STATES DISTRICT COURT FOR
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI**

| | |
|---|---|
| **MELISSA ALBERS** | Case No. |
| Plaintiff, individually and on behalf of all others similarly situated, | Judge |
| | Magistrate Judge |
| v. | **CLASS ACTION COMPLAINT FOR DAMAGES** |
| **WILMINGTON SAVINGS FUND SOCIETY, F.S.B.,** a Delaware Corporation; **ASCENSION DATA & ANALYTICS, LLC,** a Delaware Limited Liability Company; and **PAIRPREP, INC. d/b/a OPTICSML,** a Delaware Corporation, | **JURY DEMAND ENDORSED HEREIN** |
| Defendant(s) | |

Plaintiff MELISSA ALBERS, individually, and on behalf of all others similarly situated, for her Class Action Complaint against Defendants WILMINGTON SAVINGS FUND SOCIETY, FSB, ASCENSION DATA & ANALYTICS LLC, and PAIRPREP, INC. d/b/a OPTICSML (collectively, "Defendants"), alleges, based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters, as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.      Plaintiff MELISSA ALBERS ("Plaintiff") is a natural person with a principle place of residence ("Plaintiff's Residence") located in Clermont County, Ohio.

2.      Defendant WILMINGTON SAVINGS FUND SOCIETY, FSB ("Wilmington") is a Delaware corporation with a principal place of business at 500 Delaware Avenue, Wilmington, DE 19801.

3.      Defendant ASCENSION DATA & ANALYTICS LLC ("Ascension") is a Delaware limited liability company with a principal place of business at 2501 Parkview Drive, Suite 221, Fort Worth, Texas 76102.

4.      Defendant PAIRPREP, INC. is a Delaware corporation doing business as OPTICSML ("OpticsML") with a principal place of business at 415 Madison Avenue, 4th Floor, New York, New York 10017.

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because Plaintiff believes the amount in controversy in this matter exceeds $5,000,000 and because members of the putative Class are from different states than some or all of Defendants.

6.      Venue is proper in this District, pursuant to 28 U.S.C. § 1391, because Plaintiff is a resident of this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## DEFENDANTS' BUSINESS OPERATIONS

7.      Plaintiff provided information and documents in connection with a home mortgage loan to Citifinancial Servicing LLC, a Delaware limited liability company, successor by merger to Citifinancial, Inc., an Ohio corporation ("Citifinancial").

8.      Wilmington is a federally-regulated bank which, *inter alia*, owns mortgages on residential real estate. Citifinancial assigned Plaintiff's home mortgage to Wilmington, as Trustee of the Stanwich Mortgage Loan Trust A ("Stanwich").

9. Ascension is "a data and analytics company" that "provides data analysis and portfolio valuations" for companies in the financial industry, including Wilmington.[1] "Among its services,[] Ascension converts paper documents and handwritten notes into computer-readable files" through a process known as "optical character recognition" ("OCR").[2]

10. Ascension contracted with a third-party vendor—OpticsML—to assist with Ascension's OCR processing of documents related to mortgage and loan applications.

## THE ASCENSION DATA BREACH

11. Plaintiff brings this suit on behalf of herself and a Class of similarly situated individuals against Defendants for Defendants' failure to secure and protect Plaintiff's and Class members' personal and financial information.

12. In January 2019, several media outlets reported that more than 24 million financial and banking documents related to tens of thousands of loans and mortgages from some of the biggest banks in the United States was made public online.[3]

13. It was reported that the financial and banking documents were readily accessible on an online storage server that was neither locked nor password protected.[4] The lack of a secure lock or password meant that anyone could access and read the compromised documents.

14. The server contained more than a decade's worth of data. The compromised documents included loan and mortgage agreements, repayment schedules, and tax documents.

15. On information and belief, Wilmington and other financial institutions provided the financial and banking documents to Ascension for data analysis and portfolio valuations. Acsension then hired OpticsML to scan the documents.

---

[1] *See* https://techcrunch.com/2019/01/23/financial files/ (last visited Mar. 14, 2019).
[2] *Id.*
[3] *See*, *e.g.*, *id.*
[4] *Id.*

16.     Within the compromised documents were highly sensitive personal and financial information of individuals. For example, the compromised documents included: names; addresses; birth dates; Social Security numbers; loan information; bank account, credit, or debit card information; driver's license number; credit file; and any other information that an individual may have provided as part of a mortgage loan application ("personal and financial information").

17.     Ascension and Stanwich confirmed the breach occurred and represented that two cloud-servers belonging to OpticsML were subject to unauthorized access by foreign IP addresses (the "Ascension Data Breach"). *See* **Exhibit A**, Notice of Ascension Data Breach letter ("Notice").

18.     The unauthorized access of the personal and financial information could have been acquired as early as February 2018 until January 2019. *Id.* The database was shut down by OpticsML on January 15, 2019.

19.     After the database was shut down, a second smaller trove of data was exposed in a separate Amazon S3 storage server whose permissions had been set to public from the default private settings.[5]

20.     The Amazon S3 storage server contained 21 files containing 23,000 pages of PDF documents stitched together. Some or all of the data was the same that had been in the storage server database that was previously shut down.

21.     The files in the Amazon S3 storage server were documents from banks and financial institutions across the United States and included loans and mortgage agreements, documents from the U.S. Department of Housing and Urban Development, W-2 tax forms, loan repayment schedules, and other sensitive financial information.

---

[5] *See* https://techcrunch.com/2019/01/24/mortgage-loan-leak-gets-worse/ (last visited Mar. 15, 2019).

22.     Although Defendants were storing sensitive documents containing personal and financial information that Defendants knew were valuable and vulnerable to misuse, Defendants were negligent in protecting the personal and financial information.

23.     Despite the unauthorized access to the two cloud servers by foreign IP addresses as early as February 2018, which Ascension and Stanwich claim to have only learned about in January 15, 2019, Notice was not mailed to Plaintiff and other Class members regarding the Ascension Data Breach until February 14, 2019.

24.     The Notice that Plaintiff received from Stanwich and Ascension acknowledges that a treasure trove of highly sensitive personal and financial information was subject to unauthorized access by foreign IP addresses. Even though Plaintiff and Class members are now at a high risk of identity theft for many years to come, the Notice offers Plaintiff credit monitoring and identity theft protection services for only two years. Plaintiff and Class members were also advised to be vigilant and review their credit reports for suspected incidents of identity theft, and to educate themselves about security freezes, fraud alerts, and other steps to protect themselves against identity theft.

## DAMAGES FROM DATA BREACHES

25.     The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[6]

26.     The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit

---

[6] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," pg. 2, by U.S. Government Accountability Office, June 2007, at: https://www.gao.gov/new.items/d07737.pdf (last visited Mar. 15, 2019) ("GAO Report").

bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[7]

27.    Identity thieves use stolen personal information such as SSNs for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

28.    Identity thieves can also use SSNs to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and SSN to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

29.    A study by the Identity Theft Resource Center show the multitude of harms caused by fraudulent use of personal and financial information:

---

[7] *See* https://www.identitytheft.gov/Steps (last visited Mar. 15, 2019).



Source: "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/17, at: https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last visited Mar. 15, 2019).

30.     There may be a time lag between when harm occurs versus when it is discovered, and also between when personal and financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at page 29.

31.     Personal and financial information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

32.     Thus, there is a strong probability that entire batches of stolen information have been dumped on the black market, and are yet to be dumped on the black market, meaning Plaintiff and Class members are at an increased risk of fraud and identity theft for many years into the future.

## PLAINTIFF'S AND CLASS MEMBERS' DAMAGES

33.     As a direct and proximate result of Defendants' conduct, Plaintiff and the Class and Subclass members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

34.     Plaintiff and members of the Class and Subclass have or will suffer actual injury as a direct result of the Ascension Data Breach. In addition to fraudulent charges, loss of use of and access to their account funds and costs associated with inability to obtain money from their accounts, and damage to their credit, many victims suffer ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Ascension Data Breach relating to:

a.      Finding fraudulent charges;

b.      Canceling and reissuing credit and debit cards;

c.      Purchasing credit monitoring and identity theft prevention;

d.      Addressing their inability to withdraw funds linked to compromised accounts;

e.      Taking trips to banks and waiting in line to obtain funds held in limited accounts;

f.      Placing "freezes" and "alerts" with credit reporting agencies;

g.  Spending time on the phone with or at the financial institution to dispute fraudulent charges;

h.  Contacting their financial institutions and closing or modifying financial accounts;

i.  Resetting automatic billing and payment instructions from compromised credit and debit cards to new cards;

j.  Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k.  Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

35.  Moreover, Plaintiff and the Class and Subclass members have an interest in ensuring that their personal and financial information, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including making sure that the storage of data or documents containing personal and financial information is not accessible online and that access to such data is password-protected.

36.  As a direct and proximate result of Defendants' actions and inactions, Plaintiff and Class and Subclass members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

## FACTS RELEVANT TO PLAINTIFF

37.  Plaintiff is a citizen of Ohio (and was during the period of the Ascension Data Breach).

38.  As a direct result of the Ascension Data Breach, Plaintiff took and continues to take measures that she otherwise would not have taken to ensure that her identity is not stolen and that her accounts are not compromised. For example, on or about March 7 and 8, 2019, Plaintiff spent time obtaining and reviewing her credit reports from Experian, Equifax, and

TransUnion. After reviewing her credit reports, Plaintiff obtained and requested a freeze on her credit with TransUnion and signed up for credit monitoring services with CreditKarma.

39.     By placing a freeze of her credit, Plaintiff will be limited or prevented from obtaining new lines of credit or making purchases without expending additional time and energy to unfreeze her credit or verify her identity with potential creditors.

40.     Plaintiff intends to monitor her Experian and Equifax credit reports monthly and as needed, cancel any credit or debit card that she provided as part of her mortgage loan application and request a new card(s)—an action she would not have had to take had the Ascension Data Breach not occurred.

## CLASS ALLEGATIONS

41.     **Class Definition**: Plaintiff brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a nationwide class of similarly situated individuals and entities ("the Class"), defined as follows:

> All individuals whose personally identifiable information and/or financial information was provided to Ascension Data & Analytics LLC and compromised in the Ascension Data Breach.

> Excluded from the Class are: (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or its parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

42.     **Subclass Definition**: Plaintiff also brings this action pursuant to Fed. R. Civ. P. 23, on behalf of Subclass of similarly situated individuals ("the Subclass"), defined as follows:

> All individuals whose personally identifiable information and/or financial information was provided to Wilmington Savings Fund Society, FSP, as trustee of the Stanwich Mortgage Loan Trust A, and thereafter provided to Ascension Data

& Analytics LLC and compromised in the Ascension Data Breach.

Excluded from the Subclass are: (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or its parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Subclass; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

43.     **Numerosity**: Upon information and belief, the Class and Subclass are each comprised of tens of thousands of Class members, as it was reported that financial and banking documents related to tens of thousands of loans and mortgages were affected. Thus, the Class and Subclass are so numerous that joinder of all members is impracticable.  Class members can easily be identified through Defendants' records, or by other means.

44.     **Commonality and Predominance**: There are several questions of law and fact common to the claims of Plaintiff and Class and Subclass members, which predominate over any individual issues, including:

a.     Whether Defendants adequately protected the personal and financial information of Plaintiff and members of the Class and Subclass;

b.     Whether Defendants placed the personal and financial information of Plaintiff and members of the Class and Subclass in an online storage server without a secure lock on any of the files and was not password-protected;

c.     Whether Defendants adopted, implemented, and maintained reasonable policies and procedures to prevent the unauthorized access to the personal and financial information of Plaintiff and members of the Class and Subclass;

d.     Whether Defendants properly trained and supervised their employees to protect the personal and financial information of Plaintiff and members of the Class and Subclass;

e.     Whether Defendants promptly notified Plaintiff and members of the Class and Subclass of the Ascension Data Breach;

f.     Whether Defendants owed a duty to Plaintiff and members of the Class and Subclass to safeguard and protect their personal and financial information;

11

g.      Whether Defendants breached their duty to Plaintiff and members of the Class and Subclass to safeguard and protect their personal and financial information;

h.      Whether Defendants breached their duty to Plaintiff and members of the Class and Subclass by their failure to adopt, implement, and maintain reasonable policies and procedures to safeguard and protect the personal and financial information of Plaintiff and members of the Class and Subclass; and

i.      Whether Defendants are liable for the damages suffered by Plaintiff and members of the Class and Subclass as a result of the Ascension Data Breach.

45.     **Typicality**: Plaintiff's claims are typical of the claims of members of the Class and Subclass. All claims are based on the same legal and factual issues. Plaintiff and each of the Class and Subclass members provided documents containing their personal and financial information to Wilmington or other bank or financial institutions in connection with a mortgage or loan, those financial entities provided the documents to Ascension, Ascension contracted with OpticsML, and the documents were placed in an online storage server that did not have a secure lock and was not password-protected. Defendants' conduct was uniform to Plaintiff and all Class and Subclass members.

46.     **Adequacy of Representation**: Plaintiff will fairly and adequately represent and protect the interests of the members of the Class and Subclass, and has retained counsel competent and experienced in complex class actions. Plaintiff has no interest antagonistic to those of members of the Class and Subclass, and Defendants have no defenses unique to Plaintiff. The questions of law and fact common to the proposed Class and Subclass predominate over any questions affecting only individual members of the Class or Subclass.

47.     **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for proposed members of the Class and Subclass to

prosecute their claims individually. The trial and the litigation of Plaintiff's claims are manageable.

**COUNT I**
**Negligence**
*(On behalf of Plaintiff and the Class Against Ascension and OpticsML)*

48.     Plaintiff repeats and re-alleges the allegations of paragraphs 1-47 with the same force and effect as though fully set forth herein.

49.     Ascension and OpticsML knew, or should have known, of the risks inherent in collecting and storing the personal and financial information of Plaintiff and Class members and the importance of adequate security. Defendants were well aware of numerous, well-publicized data breaches that exposed the personal and financial information of individuals.

50.     Ascension and OpticsML had a common law duty to prevent foreseeable harm to those whose personal and financial information they were entrusted. This duty existed because Plaintiff and Class members were the foreseeable and probable victims of the failure of Ascension and OpticsML to adopt, implement, and maintain reasonable security measures so that Plaintiff's and Class members' personal and financial information would not be accessible in an unsecured online storage server and not password-protected.

51.     Ascension and OpticsML each had a special relationship with Plaintiff and Class members. Ascension and OpticsML were entrusted with Plaintiff's and Class members' documents containing their personal and financial information, and Ascension and OpticsML were in a position to protect the documents (and the personal and financial information stored on them) from public exposure.

52.     The duties of Ascension and OpticsML also arose under section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or

13

affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect individuals' personal and financial information by companies. Various FTC publications and data security breach orders further form the basis of the duties of Ascension and OpticsML.

53.     The duties of Ascension and OpticsML also arose pursuant to state laws, which require, *inter alia*, companies to implement and maintain reasonable security measures to protect consumers' personal and financial information and promptly notify individuals of any breach.

54.     Ascension and OpticsML each had a duty to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Plaintiff's and Class members' personal and financial information in their possession so that the personal and financial information would not come within the possession, access, or control of unauthorized persons.

55.     More specifically, the duties of Ascension and OpticsML included, among other things, the duty to:

        a.    Adopt, implement, and maintain policies, procedures, and security measures for protecting documents containing an individual's personal and financial information, including policies, procedures, and security measures to ensure that the documents are not accessible online in unsecured storage servers and are password-protected;

        b.    Adopt, implement, and maintain reasonable policies and procedures to prevent the sharing of documents containing an individual's personal and financial information with entities that failed to adopt, implement, and maintain policies, procedures, and security measures to ensure that the

documents are not accessible online in unsecured storage servers and are password-protected;

c.  Adopt, implement, and maintain reasonable policies and procedures to ensure that they are sharing documents containing an individual's personal and financial information only with entities that have adopted, implemented, and maintained policies, procedures, and security measures to ensure that the documents are not accessible online in unsecured storage servers and are password-protected;

d.  Properly train its employees to protect documents containing an individual's personal and financial information; and

e.  Adopt, implement, and maintain processes to quickly detect a data breach and to promptly act on warnings about data breaches.

56.  Ascension and OpticsML breached the foregoing duties to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the documents containing an individual's personal and financial information in their possession so that the documents would not come within the possession, access, or control of unauthorized persons. The Notice acknowledges that two cloud servers containing the documents with the personal and financial information of Plaintiff and Class members were subject to unauthorized access by foreign IP addresses that could have been acquired as early as February 2018 through January 2019.

57.  Ascension and OpticsML have an affirmative duty to notify Plaintiff and Class members in the most expedient time possible of a breach of the security of their personal and financial information if it was, or is reasonably believed to have been, acquired by an

unauthorized person so that Plaintiff and Class members can take appropriate and timely measures to mitigate damages, protect against adverse consequences, and thwart future incidences of identity theft.  *See e.g.*, Ohio Rev. Code § 1349.19B(2); Del. Code Ann. tit. 6, § 12B-102; N.Y. Gen. Bus. Law § 899-aa; Tex. Bus. & C § 521.053.

58.     Despite the Ascension Data Breach having occurred in as early as February 2018—which Ascension and Stanwich claim to have only learned of in January 2019—Notice of the Ascension Data Breach was not made to Plaintiff and the Class until February 14, 2019.

59.     Ascension and OpticsML breached their duty to promptly notify Plaintiff and Class members that their personal and financial information was accessed by unauthorized persons.

60.     Through the failure of Ascension and OpticsML to provide timely notification to Plaintiff and Class members, Ascension and OpticsML prevented Plaintiff and Class members from taking timely and proactive steps to secure their financial data, bank accounts, and other accounts where their personal and financial information could be used for fraudulent purposes, including identity theft.

61.     Ascension and OpticsML acted with reckless disregard for the security of the personal and financial information of Plaintiff and the Class because Ascension and OpticsML knew or should have known that their data security practices were not adequate to safeguard the personal and financial information that they collected and stored.

62.     Ascension and OpticsML acted with reckless disregard for the rights of Plaintiff and the Class by failing to promptly detect the Ascension Data Breach and provide prompt notice so that Plaintiff and Class members could take measures to protect themselves from damages caused by the unauthorized access of the documents compromised in the Ascension Data Breach.

63. As a result of the conduct of Ascension and OpticsML, Plaintiff and Class members have suffered and will continue to suffer actual damages including, but not limited to, expenses and/or time spent on credit monitoring; time spent scrutinizing bank statements, credit card statements, and credit reports; time spent initiating fraud alerts; and increased risk of future harm. Further, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

## COUNT II
### Negligence
### (On behalf of Plaintiff and the Subclass against Wilmington)

64. Plaintiff repeats and re-alleges the allegations of paragraphs 1-47 with the same force and effect as though fully set forth herein.

65. Wilmington knew, or should have known, of the risks inherent in collecting and storing the personal and financial information of Plaintiff and Subclass members and the importance of adequate security. Wilmington was well aware of numerous, well-publicized data breaches that exposed the personal and financial information of individuals.

66. Wilmington had a common law duty to prevent foreseeable harm to those whose personal and financial information they were entrusted. This duty existed because Plaintiff and Subclass members were the foreseeable and probable victims of the failure of Wilmington to adopt, implement, and maintain reasonable security measures so that Plaintiff's and Subclass members' personal and financial information would not be accessible in an unsecured online storage server and not password-protected.

67. Wilmington had a special relationship with Plaintiff and Subclass members. Plaintiff's and the Subclass members' willingness to entrust Wilmington with their documents

17

containing their personal and financial information was predicated on the understanding that Wilmington would take adequate security precautions.

68.     Plaintiff and Subclass members provided their documents (and the personal and financial information stored on them) to Wilmington with the expectation that it would safeguard and protect the documents and not share the documents with other entities without ensuring that those entities would also safeguard and protect them.

69.     The duties of Wilmington also arose under section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect individuals' personal and financial information by companies. Various FTC publications and data security breach orders further form the basis of the duties of Wilmington.

70.     Wilmington's duties also arose pursuant to state laws, which require, *inter alia*, companies to implement and maintain reasonable security measures to protect consumers' personal and financial information and promptly notify individuals of any breach.

71.     Wilmington had a duty to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Plaintiff's and Subclass members' personal and financial information in their possession so that the personal and financial information would not come within the possession, access, or control of unauthorized persons.

72.     More specifically, the duties of Wilmington included, among other things, the duty to:

> a.     Adopt, implement, and maintain policies, procedures, and security measures for protecting documents containing an their customers'

personal and financial information, including policies, procedures, and security measures to ensure that the documents are not accessible online in unsecured storage servers and are password-protected;

b. Adopt, implement, and maintain reasonable policies and procedures to prevent the sharing of documents containing an individual's personal and financial information with entities that failed to adopt, implement, and maintain policies, procedures, and security measures to ensure that the documents are not accessible online in unsecured storage servers and are password-protected;

c. Adopt, implement, and maintain reasonable policies and procedures to ensure that they are sharing documents containing an individual's personal and financial information only with entities that have adopted, implemented, and maintained policies, procedures, and security measures to ensure that the documents are not accessible online in unsecured storage servers and are password-protected;

d. Properly train its employees to protect documents containing an individual's personal and financial information; and

e. Adopt, implement, and maintain processes to quickly detect a data breach and to promptly act on warnings about data breaches.

73. Wilmington breached the foregoing duties to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their customers' documents containing personal and financial information in their possession so that the documents would not come within the possession, access, or control of unauthorized persons. The Notice

19

acknowledges that two cloud servers containing the documents with the personal and financial information of Plaintiff and Subclass members were subject to unauthorized access by foreign IP addresses that could have been acquired as early as February 2018 through January 2019.

74. Wilmington has an affirmative duty to notify Plaintiff and Subclass members in the most expedient time possible of a breach of the security of their personal and financial information if it was, or is reasonably believed to have been, acquired by an unauthorized person so that Plaintiff and Subclass members can take appropriate and timely measures to mitigate damages, protect against adverse consequences, and thwart future incidences of identity theft. *See e.g.*, Ohio Rev. Code § 1349.19B(2); Del. Code Ann. tit. 6, § 12B-102; N.Y. Gen. Bus. Law § 899-aa; Tex. Bus. & C § 521.053.

75. Despite the Ascension Data Breach having occurred in as early as February 2018—which Ascension and Stanwich claim to have only learned of in January 2019—Notice of the Ascension Data Breach was not made to Plaintiff and the Subclass until February 14, 2019.

76. Wilmington breached its duty to promptly notify Plaintiff and Subclass members that their personal and financial information was accessed by unauthorized persons.

77. Through the failure of Wilmington to provide timely notification to Plaintiff and Subclass members, Wilmington prevented Plaintiff and Subclass members from taking timely and proactive steps to secure their financial data, bank accounts, and other accounts where their personal and financial information could be used for fraudulent purposes, including identity theft.

78. Wilmington acted with reckless disregard for the security of the personal and financial information of Plaintiff and the Subclass because Wilmington knew or should have known that its data security practices and/or those of third parties with whom it shared

customers' documents were not adequate to safeguard the personal and financial information that it collected, stored, and shared with third parties.

79.     Wilmington acted with reckless disregard for the rights of Plaintiff and the Subclass by failing to promptly detect the Ascension Data Breach and provide prompt notice so that Plaintiff and Subclass members could take measures to protect themselves from damages caused by the unauthorized access of the documents compromised in the Ascension Data Breach.

80.     As a result of the conduct of Wilmington, Plaintiff and Subclass members have suffered and will continue to suffer actual damages including, but not limited to, expenses and/or time spent on credit monitoring; time spent scrutinizing bank statements, credit card statements, and credit reports; time spent initiating fraud alerts; and increased risk of future harm. Further, Plaintiff and Subclass members have suffered and will continue to suffer other forms of injury and/or harm including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

## COUNT III
### Violation of the Consumer Fraud and Deceptive Trade Practices Acts of the Various States and District of Columbia
*(On Behalf of Plaintiff and the Subclass against Wilmington)*

81.     Plaintiff repeats and re-alleges the allegations of Paragraphs 1-47 with the same force and effect as though fully set forth herein.

82.     Plaintiff brings this Count individually, and on behalf of all similarly situated residents of each of the 50 states and the District of Columbia (*i.e.*, the Subclass) for violations of the respective statutory consumer protection laws, as follows:

      A.    the Alabama Deceptive Trade Practices Act, Ala.Code 1975, § 8–19–1, *et seq.*;

      B.    the Alaska Unfair Trade Practices and Consumer Protection Act, AS § 45.50.471, *et seq.*;

C.      the Arizona Consumer Fraud Act, A.R.S §§ 44-1521, *et seq.*;

D.      the Arkansas Deceptive Trade Practices Act, Ark.Code §§ 4-88-101, *et seq.*;

E.      the California Unfair Competition Law, Cal.Bus. & Prof. Code §§17200, *et seq.* and 17500 *et seq.*;

F.      the California Consumers Legal Remedies Act, Civil Code §§1750, *et seq.*;

G.      the Colorado Consumer Protection Act, C.R.S.A. §6-1-101, *et seq.*;

H.      the Connecticut Unfair Trade Practices Act, C.G.S.A. § 42-110a, *et seq.*;

I.      the Delaware Consumer Fraud Act, 6 Del. C. § 2511, *et seq.*;

J.      the D.C. Consumer Protection Procedures Act, DC Code § 28-3901, *et seq.*;

K.      the Florida Deceptive and Unfair Trade Practices Act, FSA § 501.201, *et seq.*;

L.      the Georgia Fair Business Practices Act, OCGA § 10-1-390, *et seq.*;

M.      the Hawaii Unfair Competition Law, H.R.S. § 480-1, *et seq.*;

N.      the Idaho Consumer Protection Act, I.C. § 48-601, *et seq.*;

O.      the Ohio Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 501/1 *et seq.*;

P.      the Indiana Deceptive Consumer Sales Act, IN ST § 24-5-0.5-2, *et seq.*;

Q.      The Iowa Private Right of Action for Consumer Frauds Act, Iowa Code Ann. § 714H.1, *et seq.*;

R.      the Kansas Consumer Protection Act, K.S.A. § 50-623, *et seq.*;

S.      the Kentucky Consumer Protection Act, KRS 367.110, *et seq.*;

T.      the Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401, *et seq.*;

U.      the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 205-A, *et seq.*;

V.      the Maryland Consumer Protection Act, MD Code, Commercial Law, § 13-301, *et seq.*;

W.      the Massachusetts Regulation of Business Practices for Consumers Protection Act, M.G.L.A. 93A, *et seq*.;

X.      the Michigan Consumer Protection Act, M.C.L.A. 445.901, *et seq*.;

Y.      the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq*.;

Z.      the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq*.;

AA.     the Missouri Merchandising Practices Act, V.A.M.S. § 407.010, *et seq*.;

BB.     the Montana Unfair Trade Practices and Consumer Protection Act of 1973, Mont. Code Ann. § 30-14-101, *et seq*.;

CC.     the Nebraska Consumer Protection Act, Neb.Rev.St. §§ 59-1601, *et seq*.;

DD.     the Nevada Deceptive Trade Practices Act, N.R.S. 41.600, *et seq*.;

EE.     the New Hampshire Regulation of Business Practices for Consumer Protection, N.H.Rev.Stat. § 358-A:1, *et seq*.;

FF.     the New Jersey Consumer Fraud Act, N.J.S.A. 56:8, *et seq*.;

GG.     the New Mexico Unfair Practices Act, N.M.S.A. §§ 57-12-1, *et seq*.;

HH.     the New York Consumer Protection from Deceptive Acts and Practices, N.Y. GBL (McKinney) § 349, *et seq*.;

II.     the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen Stat. § 75-1.1, *et seq*.;

JJ.     the North Dakota Consumer Fraud Act, N.D. Cent.Code Chapter 51-15, *et seq*.;

KK.     the Ohio Consumer Sales Practices Act, R.C. 1345.01, *et seq*.;

LL.     the Oklahoma Consumer Protection Act, 15 O.S.2001, §§ 751, *et seq*.;

MM.     the Oregon Unlawful Trade Practices Act, ORS 646.605, *et seq*.;

NN.     the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq*.;

OO.     the Rhode Island Deceptive Trade Practices Act, G.L.1956 § 6-13.1-5.2(B), *et seq*.;

PP. the South Carolina Unfair Trade Practices Act, SC Code 1976, §§ 39-5-10, *et seq*.;

QQ. the South Dakota Deceptive Trade Practices and Consumer Protection Act, SDCL § 37-24-1, *et seq*.;

RR. the Tennessee Consumer Protection Act, T.C.A. § 47-18-101, *et seq*.;

SS. the Texas Deceptive Trade Practices-Consumer Protection Act, V.T.C.A., Bus. & C. § 17.41, *et seq*.;

TT. the Utah Consumer Sales Practices Act, UT ST § 13-11-1, *et seq*.;

UU. the Vermont Consumer Fraud Act, 9 V.S.A. § 2451, *et seq*.;

VV. the Virginia Consumer Protection Act of 1977, VA ST § 59.1-196, *et seq*.;

WW. the Washington Consumer Protection Act, RCWA 19.86.010, *et seq*.;

XX. the West Virginia Consumer Credit And Protection Act, W.Va.Code § 46A-1-101, *et seq*.;

YY. the Wisconsin Deceptive Trade Practices Act, WIS.STAT. § 100, *et seq*.; and

ZZ. the Wyoming Consumer Protection Act, WY ST § 40-12-101, *et seq*.

83. Wilmington engaged in unfair and deceptive acts or practices when it accepted documents containing the personal and financial information of Plaintiff and Subclass members and then failed to adopt, implement, and maintain reasonable measures to protect the information and, in fact, shared the documents with other entities that did not adopt, implement, and maintain reasonable measures to protect the information. Wilmington failed to inform Plaintiff and Subclass members of its actions and inactions that culminated in the Ascension Data Breach.

84. Wilmington intended that Plaintiff and the members of the Subclass rely upon Wilmington's omissions.

85. The omissions of Wilmington possess the tendency or capacity to mislead and create the likelihood of deception.

24

86.     The above-described deceptive and unfair acts and practices were used or employed in the conduct of trade or commerce.

87.     The above-described deceptive and unfair acts offend public policy and cause substantial injury to consumers.

88.     The conduct of Wilmington implicates consumer protection concerns as the Ascension Data Breach affects the public, caused Plaintiff and Subclass members to have to obtain additional credit monitoring services, caused them to have to freeze their credit, caused them to have to obtain new credit and/or debit cards that were part of their mortgage loan applications, and will continue to cause harm to Plaintiff and Subclass members in the form of increased risk of identity theft for many years to come.

89.     Plaintiff and the Subclass relied upon the omissions described above.

90.     Had Plaintiff and the Subclass known that Wilmington made omissions and did not have adequate measures in place to protect their documents containing personal and financial information, they would not have provided documents containing their personal and financial information to Wilmington or they would have required Wilmington to adopt, implement, and maintain adequate security measures, including measures to ensure the information would not be provided to third parties that did not have adequate measures in place, before providing their documents.

91.     As a direct and proximate result of these unfair and unconscionable commercial practices, and as described above, Plaintiff and the members of the Subclass have suffered damages.  Plaintiff, individually, and on behalf of the Subclass, seeks actual damages and punitive damages, along with reasonable attorney's fees and costs.

92.    The substantial injury outweighs any benefit to consumers or competition that may result from Wilmington's omissions and unfair practices.

**COUNT IV**
**Violation of the Fair Credit Reporting Act**
**(15 U.S.C. § 1681, *et seq.*)**
***(On behalf of Plaintiff and the Class Against Ascension)***

93.    Plaintiff repeats and re-alleges the allegations of paragraphs 1-47 with the same force and effect as though fully set forth herein.

94.    Ascension acquires and assembles consumers' financial and banking information from Wilmington and other financial institutions for use in its data analytics products.

95.    Ascension's data analytics products constitute "consumer reports" because the information contained therein bears upon consumers' "credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living" and "is used or expected to be used or collected in whole or in part for the purpose of serving as a factor" in Wilmington's and other financial institutions' credit decisions regarding those consumers.  15 U.S.C. § 1681a(d).

96.    As such, Ascension is a "consumer reporting agency" ("CRA") as that term is defined by the Fair Credit Reporting Act ("FCRA") because it regularly assembles and/or evaluates consumer credit information for the purpose of furnishing consumer reports to third parties in the form of its data analytics products, and uses interstate commerce to prepare and/or furnish the reports. 15 U.S.C. § 1681a(f).

97.    A central duty that the FCRA imposes upon CRAs is the duty to protect consumers' privacy by guarding against inappropriate disclosure to third parties.  Specifically, 15 U.S.C. § 1681b permits a CRA to disclose consumers' information only for one of a handful of exclusively defined "permissible purposes." To ensure compliance, CRAs must maintain

26

reasonable procedures to ensure that such third party disclosures are made exclusively for permissible purposes. 15 U.S.C. § 1681e(a).

98.     Plaintiff's and Class members' highly sensitive personal and financial information was compiled and stored on an online server that was neither locked nor password protected, but instead was open and available to the public. Therefore, the public's ability to access Plaintiff's and Class members' information was not the result of Ascension's *inaction*, but was the result of Ascension's decision to make that information available to anyone who wished to view it.

99.     Put another way, Ascension took an affirmative step to publish Plaintiff's and Class members' highly sensitive personal and financial information to members of the public— *i.e.*, posting that information on a publicly available server—in the same way that owners of other websites publish the content thereon to members of the public. As such, the information accessed in the Ascension Data Breach was not "stolen," in the same sense that information returned as a result of a Google search is not "stolen" by the individual performing such a search.[8]

100.     Based on the foregoing, each time a member of the public accessed the server on which Plaintiff's and Class members' information was stored, Ascension furnished that person with a consumer report.

101.     However, because Ascension made those consumer reports available to the public at large, Ascension did not take reasonable steps to limit the dissemination of those consumer reports as required by 15 U.S.C. § 1681e(a).

102.     Ascension's violations of 15 U.S.C. § 1681e(a) were willful, as Ascension knew that Plaintiff's and Class members' highly sensitive personal and financial information was

_____

[8] To the extent that this Complaint characterizes access to this information as "unauthorized," for purposes of this Count, that term should be construed to mean that access to this information was not for a purpose authorized by 15 U.S.C. § 1681b.

compiled and stored on an online server that was neither locked nor password protected, and that it could be accessed by members of the public at large. Even if Ascension's violations of 15 U.S.C. § 1681e(a) are not deemed to be willful, they are at the very least negligent because Ascension should have known that Plaintiff's and Class members' highly sensitive personal and financial information was compiled and stored on an online server that was neither locked nor password protected, and that it could be accessed by members of the public at large.

103. The FCRA also requires CRAs to "follow reasonable procedures to assure maximum possible accuracy of the information" contained in a consumer report. 15 U.S.C. § 1681e(b).

104. As part of its data analytics services, Ascension published Plaintiff's and Class members' consumer reports to Wilmington and other financial institutions.

105. However, as noted above, the highly sensitive personal and financial information complied and maintained by Ascension could be used to perpetrate identity theft.

106. Therefore, the consumer reports that Ascension published to Wilmington and other financial institutions was based on information that was subject to fraudulent manipulation.

107. Because Ascension did not undertake any procedures to ensure that the information in the consumer reports that it published to Wilmington and other financial institutions was genuine—such as by securing the server on which that information was stored— Ascension did not "follow reasonable procedures to assure maximum possible accuracy of the information" contained in Plaintiff's and Class members' consumer reports in violation of 15 U.S.C. § 1681e(b).

108. Ascension's violations of 15 U.S.C. § 1681e(b) were willful, as Ascension knew that the information contained in Plaintiff's and Class members' consumer reports was subject to

fraudulent manipulation, but still published those consumer reports to Wilmington and other financial institutions anyway. Even if Ascension's violations of 15 U.S.C. § 1681e(b) are not deemed to be willful, they are at the very least negligent because Ascension should have known that the information contained in Plaintiff's and Class members' consumer reports was subject to fraudulent manipulation, but still published those consumer reports to Wilmington and other financial institutions anyway.

109.    As a result of Ascension's willful and/or negligent violations of the FCRA, Plaintiff and Class members have suffered and will continue to suffer actual damages including, but not limited to, expenses and/or time spent on credit monitoring; time spent scrutinizing bank statements, credit card statements, and credit reports; time spent initiating fraud alerts; and increased risk of future harm. Further, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

110.    Plaintiff and members of the Class are entitled to recovery of actual and statutory damages, as well as attorneys' fees and costs, pursuant to 15 U.S.C. § 1681o(a) and 15 U.S.C. § 1681n(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff MELISSA ALBERS, individually, and on behalf of all others similarly situated, prays for an Order as follows:

A.    Finding that this action satisfies the prerequisites for maintenance as a class action and certifying the Class and Subclass defined herein;

B.    Designating Plaintiff as representative of the Class and Subclass, and her undersigned counsel as Class Counsel;

C.    Entering judgment in favor of Plaintiff and the Class, and against Defendants Ascension and OpticsML;

D.      Entering judgment in favor of Plaintiff and the Subclass, and against Defendant Wilmington;

E.      Awarding Plaintiff and the Class and Subclass actual damages, statutory damages, punitive damages,  and all other forms of available relief;

F.      Entering an injunction requiring Defendants to adopt, implement, and maintain adequate security measures to protect Plaintiff's and Class and Subclass members' personal and financial information;

G.      Awarding Plaintiff's Counsel their attorney's fees and costs, including interest thereon, as allowed or required by law; and

H.      Granting all such further and other relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts so triable.


Respectfully Submitted,


By: /s/ Marc E. Dann
        Marc E. Dann (0039425)
        Brian D. Flick (0081605)
        Daniel M. Solar (0085632)
        **DANNLAW**
        P.O. Box. 6031040
        Cleveland, Ohio 44103
        Office:  (216) 373-0539
        Facsimile: (216) 373-0536
        notices@dannlaw.com


        Thomas A. Zimmerman, Jr. (*pro hac vice* anticipated)
        *tom@attorneyzim.com*
        Sharon A. Harris (*pro hac vice* anticipated)
        *sharon@attorneyzim.com*
        **ZIMMERMAN LAW OFFICES, P.C.**
        77 W. Washington Street, Suite 1220
        Chicago, Illinois 60602
        (312) 440-0020 telephone
        (312) 440-4180 facsimile
        www.attorneyzim.com

        *Counsel for Plaintiff Melissa Albers and the Putative Class and Subclass*

30